UNITED STATES of America,
Plaintiff, Appellant,

v.

OTTATI & GOSS, INC., et al.,
Defendants, Appellees.

UNITED STATES of America,
Plaintiff, Appellee,

v.

OTTATI & GOSS, INC., et al.,
Defendants, Appellees.

Appeal of STATE OF NEW HAMP-
SHIRE, Intervenor/Plaintiff.

Nos. 89–1063, 89–1065.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1989.

Decided April 4, 1990.

William B. Lazarus, with whom David B. Hird, Michael O. Hill, Anne S. Almy, Dept. of Justice, Lands Div., Appellate Section, Donald A. Carr, Acting Asst. Atty. Gen., Peter E. Papps, U.S. Atty., Joseph Freedman and Nancy Elizabeth Caldwell, U.S. E. P.A., were on brief for appellant.

Keith A. Jones, with whom Carol Barthel, J.B. Ruhl, Fulbright & Jaworski, Frank E. Kenison, Nixon, Hall & Hess, and Howard E. Post, were on brief for appellee, Intern. Minerals & Chemical Corp.

Before CAMPBELL, Chief Judge, BROWN,\* Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

Nearly ten years ago the Environmental Protection Agency ("EPA") began this lawsuit by asking a court to require several companies to clean up a thirty-four acre hazardous waste site near Kingston, New Hampshire. The suit eventually consisted of two claims that are relevant here, both made under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"). First, EPA said that "actual or threatened release[s]" of "hazardous substance[s]" from the site posed "an imminent and substantial endangerment to the public health or welfare or the environment." It therefore asked the district court, in light of the problem, "to grant such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a) (first sentence). Second, EPA pointed out that it had spent considerable government money beginning to clean up the site. It asked the court to require

defendants in the case, various owners, operators, and handlers, to repay the government for "all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

The suit was complicated. The United States originally brought suit under § 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, but later amended its complaint to allege causes of action under CERCLA, 42 U.S.C. §§ 9601–9657. By 1983 the State of New Hampshire and the Town of Kingston had joined as plaintiffs, many of the defendants had filed third-party claims and crossclaims, and a total of seventeen individuals and firms (present or previous owners, handlers, or operators) had become defendants. The site itself consisted of several different areas, including a one-acre site leased to defendant Ottati & Goss, Inc. (the "O & G site"), and a six-acre site owned by defendant Great Lakes Container Corporation (the "GLCC site"). On or near the site were two brooks, a pond, and a marsh area.

While the litigation proceeded, EPA itself began to clean up part of the site, adding to the costs it intended to recover, and two of the defendants also began to help clean up. In the meantime, the court divided the trial itself into two phases. The first phase would determine which defendants the law required to help clean up and to pay costs. The second phase would determine precisely what further cleanup actions the law (42 U.S.C. § 9606(a) (first sentence)) required, and how much the liable firms should pay EPA (42 U.S.C. § 9607).

The court began the first phase of trial on December 5, 1983, concluded the trial on June 13, 1985, and found that the law required fifteen defendants either to engage in further cleanup or to pay part of the costs, or both. *See United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361 (D.N.H. 1985). The second phase of trial began on February 2, 1987, concluded on July 16, 1987, and culminated in injunctive orders requiring particular defendants to engage in certain specified additional cleanup, and

\* Of the Fifth Circuit, sitting by designation.

to pay certain specified costs. *See United States v. Ottati & Goss*, 694 F.Supp. 977 (D.N.H.1988). Before, during, or just after the trial, all but one of the defendants agreed to settle their dispute with EPA. One of the defendants, International Minerals & Chemical Corporation (IMC), which had owned and operated the GLCC portion of the site for about three years between 1973 and 1976, would not settle. The EPA has appealed the court's final injunctive order insofar as it applies to that single remaining defendant.

EPA raises three sorts of legal issues on this appeal. First, its appeal raises a general question of statutory interpretation—a question with implications for other cases as well as this one. It asks what legal standard a court should use in deciding whether to grant the particular relief EPA requests when EPA brings an action under *the first sentence* of 42 U.S.C. § 9606(a). Must a court simply grant EPA's requested injunctive relief unless it determines that EPA's request is "arbitrary, capricious, an abuse of discretion?" 5 U.S.C. § 706(2)(A). Or is the district court free to make its own determinations of fact and to exercise its own judgment in fashioning relief? We conclude that the court, acting pursuant to that statutory sentence, is not bound by administrative law's "arbitrary, capricious" standard.

Second, EPA argues that the record does not adequately support the relief determinations that the district court made. It believes that the record required that court to order IMC to clean up the site somewhat more thoroughly. EPA's arguments are highly fact-specific and evidence-related. We have examined those portions of the record (compiled over ten years and amounting to more than 40,000 pages) that the parties have cited in their briefs. Having done so, we conclude that the district court's determinations of fact and of proper relief are adequately supported, with one exception. The exception consists of the cleanup ordered in respect to volatile organic compounds (VOCs).

Third, EPA raises two "miscellaneous" arguments, one dealing with a district court statement about liability, the other dealing with that court's refusal to award EPA certain indirect costs, a refusal apparently meant as a kind of "sanction" for improper behavior. We have rejected EPA's "liability" related argument as not now properly before us. We have decided to remand the case for further explanation about the "sanction."

In sum, we have affirmed the district court's decision with two exceptions, each of which requires further district court proceedings. The first exception concerns VOC-related relief; the second concerns sanctions.

We shall now explain how we have reached these legal conclusions.

## I

### APA "Arbitrary/Capricious" Review and a CERCLA Injunction

The EPA's initial argument—an argument with implications beyond the confines of this case—concerns application of the Administrative Procedure Act's "arbitrary/capricious/abuse of discretion" standard in determining a proper injunctive remedy. The issue arises because, while the court was in the midst of the liability phase of the trial, EPA began an *administrative* proceeding to determine an appropriate cleanup remedy. This proceeding lasted about two years, it involved the creation of a seven-volume administrative record, and it led to an EPA document called the "Record of Decision" (ROD), U.S. Exh. 375 (Phase II), which said, among other things, that IMC should undertake the very kind of cleanup for which EPA later argued in court. Once it produced this document, EPA's lawyers told the district court judge that, when he ordered a cleanup remedy, the law *required* him to order just what the ROD set forth, unless he found the ROD to be "arbitrary and capricious or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2). The district court rejected this EPA claim; and the EPA now argues that the district court was wrong in doing so.

To understand our evaluation of this argument, the reader must keep two sets of background circumstances in mind. The first set concerns the statute here at issue, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9657. That statute is designed to help clean up hazardous waste sites. It gives necessary enforcement powers to EPA. It provides, roughly speaking, four separate statutory paths that EPA might follow:

1. *EPA clean up/private party reimbursement, 42 U.S.C. §§ 9604, 9607.* EPA itself can clean up a hazardous waste site, use money from a "Superfund" to pay the cost of clean up, and then obtain reimbursement from the site's owners or operators (and various other private persons). Section 9604(a)(1) authorizes EPA "to act ... to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance...." Section 9607(a) makes relevant private parties "liable for ... all costs of removal or remedial action incurred by the United States Government...."

2. *EPA seeks court injunction, 42 U.S.C. § 9606(a) (first sentence).* Where there is an "imminent and substantial endangerment to the public health or welfare or the environment," the EPA may ask the Department of Justice "to secure such relief as may be necessary" and the "district court ... shall have jurisdiction to grant *such relief as the public interest and the equities of the case shall require.*" (Emphasis added.)

3. *EPA order/court enforcement, 42 U.S.C. § 9606(a) (second sentence) and § 9606(b).* The second sentence of 42 U.S.C. § 9606(a) gives EPA the power to "take other action ... including ... issuing such orders as may be necessary to protect public health and welfare and the environment." Subsection (b) provides that EPA may bring an action in "district court to enforce such order" (and to obtain a fine for its violation).

4. *EPA order/EPA clean up/private party reimbursement/treble damages.*
42 U.S.C. § 9606(a) *(second sentence); § 9604(a); § 9607(a), (c)(3).* The EPA could issue an "order" under § 9606(a) (second sentence), but, instead of asking a court to enforce the order, the EPA could conduct a cleanup itself under § 9604(a). It could then obtain reimbursement from relevant private parties under § 9607; but, this time the private parties would be liable for treble damages, for § 9607(c)(3) says, when a person "fails without sufficient cause" to follow a remedial "order," he "may be liable ... for punitive damages in an amount ... not more than three times ... any costs incurred by the Fund...."

See *Developments in the Law—Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1485–96 (1986). See also *In re Acushnet River & New Bedford Harbor,* 722 F.Supp. 888, 890 (D.Mass.1989) (listing first three options); *United States v. Hardage,* 663 F.Supp. 1280, 1284 (W.D.Okl.1987) (same).

The second set of background circumstances, relevant only to this case, is that EPA has here pursued a combination of the first and second courses of action. Its claim for money rests upon its own cleanup expenditures and the reimbursement provided by § 9607. Its request for an injunction rests solely (as far as this appeal is concerned) upon the authority of the first sentence of § 9606(a). Indeed, in the relevant brief it filed in the trial court, EPA expressly said that it had *not* issued an "order;" and, in asking the court to model its injunctive remedy on EPA's "Record of Decision," it was *not* asking the court to "enforce an order." It stated:

> In this case, the United States has not issued an administrative order to any defendant and is not seeking treble damages or civil penalties.... The defendants in this case will have an opportunity to challenge EPA's selection of a remedy without seeking additional penalties or treble damages.

Memorandum of the United States in Support of its Motion for Pretrial Ruling (district court record, no. 1064) at 26. Moreover, the "Record of Decision" refers only to future action that EPA wants the defen-

dant (and others) to take; it does not refer to the recoupment of costs that EPA previously incurred in helping to clean up the site.

■ These background circumstances make clear that the specific legal issue before us is *not* whether the courts, in some general or abstract sense, can overturn EPA decisions where they are not arbitrary, capricious, an abuse of discretion, or otherwise unlawful; obviously, the answer to this general question is "generally no." When the EPA asks a court, for example, to enforce a lawful (nonarbitrary) EPA order, the court must enforce it. *See Acushnet*, 722 F.Supp. at 892; *Hardage*, 663 F.Supp. at 1284. Rather, the specific legal question is whether a court, in entering an injunction under the first sentence of § 9606(a), legally *must* enter the remedial injunction that EPA (lawfully and nonarbitrarily) decides is proper. We believe the answer to this question is "no." The law does not require a court, in that circumstance, to adopt EPA's chosen remedy. We base our conclusion on the following:

First, nothing in the language of the relevant sentence of the statute suggests that the court is required to accept EPA's decision about proper relief. The sentence simply says that the court "shall have jurisdiction to grant such relief as the public interest and the equities of the case may require." The words "shall have jurisdiction" imply a discretionary legal power; the word "equities" and the words "public interest" imply court-selected, not agency-selected standards. *Cf. Amoco Production Co. v. Village of Gambell*, 480 U.S 531, 541–46, 107 S.Ct. 1396, 1402–05, 94 L.Ed.2d 542 (1987) (under Alaska National Interest Lands Conservation Act, district court has equitable discretion to determine what is in "public interest"); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 319–20, 102 S.Ct. 1798, 1806–07, 72 L.Ed.2d 91 (1982) (construing Federal Water Pollution Control Act as leaving courts their traditional equitable discretionary powers to balance competing claims); *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 1088–89, 90 L.Ed. 1332 (1946) (in enforcement proceeding under Emergency Price Control Act district court has broad and flexible equitable powers unless statute clearly restricts court's equitable jurisdiction). The statutory sentence at issue here nowhere uses the words "arbitrary" or "capricious" or any other word implying court *review* of an agency decision, the context in which those *reviewing* standards typically govern.

Second, when the Administrative Procedure Act uses the words "arbitrary, capricious, abuse of discretion," it does so in speaking of the powers of a *"reviewing court"* to "set aside agency action, findings, and conclusions found to be" unlawful. 5 U.S.C. § 706. The first sentence of § 9606(a) does not foresee a court *reviewing*, say, "final agency action." *Cf.* 5 U.S.C. § 704. It seems more plausibly applicable to an emergency situation, where the agency has not yet had time to compile a thorough record and to issue an "order." In such a case, the court is not a "reviewing court," as, ordinarily, there would not be much of an agency decision or record to "review." Indeed, how would an "arbitrary/capricious" standard work under the first sentence of § 9606(a)? Precisely what, in the ordinary case, would a court be expected to review? EPA's decision to ask the Attorney General to bring the action? The Attorney General's decision to file suit? Is EPA supposed to win automatically as long as its decision to bring the action was reasonable? These questions suggest why it does not make much sense to apply standards for APA-type review of an agency's final decisions in the context of the first sentence of § 9606(a).

Third, to read the statute in this way does not significantly handicap EPA. In the circumstance where it needs immediate judicial relief, it can ask the court for an injunction under the first sentence of § 9606(a). Should EPA then wish, itself, to determine appropriate longer-range relief, it can compile an administrative record, reach a decision, and *issue an order*. Presumably, it can then ask a court to enforce that order. And when the court "reviews" that order, it must apply appropriate legal standards for judicial review. 42 U.S.C.

§ 9613(j); 5 U.S.C. § 706. EPA did *not* issue such an order here, however; nor did it ask the court to enforce any such order. And its decision not to do so is understandable, given the enormous investment of time and energy in judicial proceedings premised (as the district court believed) upon the court's independent evaluation of the judicial record. (Thus, we need not decide whether issuance of an "order" at so late a stage of the proceedings would have amounted to an "abuse of discretion.")

Fourth, it is not unusual for a regulatory statute to provide *both* for an agency to enter an order, after fairly lengthy proceedings, and *also* for the agency to ask a court for preliminary relief (say, an injunction) where circumstances require. *See, e.g.,* Federal Trade Commission Act, 15 U.S.C. § 53; Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 332; Interstate Commerce Act, 49 U.S.C. § 11703. In such cases, particularly where there has been no administrative hearing, the court would seem properly to make its determination on the basis of facts the parties bring before it, not simply on the basis of formal "arbitrary/capricious" review of a record of agency proceedings. *See, e.g., FTC v. Southwest Sunsites, Inc.,* 665 F.2d 711, 717–19 (5th Cir.) (district court has full traditional equitable powers under statutory provision allowing FTC to seek preliminary injunction), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982); *cf. Love v. Thomas,* 858 F.2d 1347, 1356–57 (9th Cir.1988) (under Federal Insecticide, Fungicide, and Rodenticide Act, where farmers sought preliminary injunction against EPA's emergency suspension of pesticide, district court could consider evidence outside administrative record), *cert. denied,* —— U.S. ——, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).

Fifth, the authority cited by EPA to the contrary is not persuasive. The legislative history it cites does not specifically discuss the *first* sentence of § 9606(a); it seems, rather, to refer to cases involving agency orders or cost determinations, which are not here at issue. EPA argues that the Superfund Amendments and Reauthoriza-tion Act of 1986, called "SARA," makes a difference. After the amendments became law, a new section, § 9621(a), said that the "President [which, in effect, means the EPA] shall select appropriate remedial actions determined to be necessary to be carried out under section 9604 or secured under section 9606 ...;" and § 9613(j) says that in "any judicial action ... judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record." The district court did not apply these provisions because the case was so long underway when SARA became law, and the parties had relied so heavily upon independent court-record-based remedial determinations, that the judge thought application of the new law would prove fundamentally unfair. *See Bradley v. Richmond School Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1084 (1st Cir. 1986). Given the procedural history of this case, the district court's conclusion has adequate legal support. But, in any event, we do not believe the enactment of SARA would make a legal difference. Section 9613(j)'s language about an administrative record refers to action *"taken or ordered"* by the President [*i.e.,* EPA]; and, as we have pointed out above, where the first sentence of § 9606(a) is at issue, typically (as here) there is no agency response action "taken" (the object is to obtain an injunction requiring such an action) and there is no agency *"order."*

A number of district courts have considered this question and have reached differing conclusions. We agree with the reasoning of the courts in *United States v. Hardage,* 663 F.Supp. 1280 (W.D.Okla. 1987), and *United States v. Conservation Chemical Co.,* 661 F.Supp. 1416 (W.D.Mo. 1987). Both of these cases involved suits for injunctive relief under § 9606(a). In *Conservation Chemical* the government sought to begin an administrative remedy selection process after five years of litigation. The court denied the request, finding "that the 1986 Amendments to CERCLA

... do not divest federal district courts of equity jurisdiction in CERCLA Section 106(a) actions." 661 F.Supp. at 1417. The court suggested that EPA could have dismissed its § 9606(a) injunctive action in order to pursue an administrative remedy, but could not continue the injunctive action while reducing the court's role to merely reviewing EPA's decision. 661 F.Supp. at 1424 n. 11. The *Hardage* court similarly differentiated between judicial review of remedial actions taken or ordered by the President and "judicial review of *proposed* remedies ... which EPA asks a court to require defendants to implement." 663 F.Supp. at 1284.

We are not persuaded by other cases that have held that an "arbitrary and capricious" standard applies in a § 9606(a) action for injunctive relief. Only one of these cases, *United States v. Seymour Recycling Co.*, 679 F.Supp. 859 (S.D.Ind.1987), actually involved an action originating under § 9606(a). Both *In re Acushnet River & New Bedford Harbor*, 722 F.Supp. 888 (D.Mass.1989), and *United States v. Bell Petroleum Services, Inc.*, 718 F.Supp. 588 (W.D.Tex.1989), involved § 9607 cost recovery actions; thus, their discussions of § 9606(a) actions are dicta.

For these reasons, we do not believe that the district court, in a § 9606(a), *first sentence*, action is legally required to accept EPA's views about remedy. Of course, nothing prevents the judge, in deciding what relief "the public interest and the equities of the case may require," from paying close attention to what EPA has learned, particularly where that learning is embodied in seven volumes of testimony and exhibits and reflects views from all affected parties. Here, however, the district court obviously did pay attention to EPA's views; indeed, much of its remedial order reflects EPA's requests; and its views differ from those of EPA only with respect to the extent of the remedy ordered. We cannot say that the court's remedial decision, insofar as it embodies these comparatively few differences, falls outside the remedial discretion that the statute confers upon the district court.

## II

EPA has raised a host of evidence-related issues. Although the district court adopted most of EPA's suggestions for relief, EPA believes the record required it to order yet more stringent relief in respect to contamination by 1) metals, 2) volatile organic compounds (VOCs), and 3) chemicals called "PCBs." Obviously, reviewing a 40,000 page record to determine whether a specific fact-based finding has adequate support poses difficult practical problems for a busy court of appeals. Recognizing that the parties have had a full opportunity to argue these matters at length in the district court, that the district court is better able than we are to resolve such issues, and that the factual issues before us concern not *whether* the site will be cleaned up, but rather likely concern who should pay the added cost of making it extremely clean, we have held both EPA and IMC to the specific language of their briefs. That is to say, we have reviewed the particular record pages they have cited in their briefs, and we have asked ourselves whether, in light of the district court's greater familiarity with this case, the appellant, EPA, has convinced us that the district court acted outside its fairly broad legal powers. With one exception—concerning VOCs—we are convinced that its determinations have adequate record support.

We shall review these claims briefly here, writing only enough to explain to the parties the basis for our conclusions.

### A

#### *Metals*

■ EPA argues that the district court should have held IMC responsible for, and ordered it to clean up, deposits of four metals (iron, manganese, nickel, and arsenic) in the groundwater. The district court did not do so for two independent reasons. First, the district court recognized that EPA, in its complaint, had listed five specific hazardous chemicals that contributed to ground and water contamination, but had not listed metals. The district court also believed that EPA had not adequately in-

formed IMC that EPA would claim contamination by metals; it thought that EPA had not pressed a "metals" claim until after the fiftieth day of trial; and it concluded that EPA's efforts to raise the "metals" issue took IMC unfairly by surprise. Consequently, when, on the fifty-sixth day of trial, IMC asked it to restrict EPA's proof to proof of contamination by the five chemicals listed in paragraph 42 of EPA's original complaint, the court granted that motion.

Second, the district court nonetheless allowed EPA to introduce its "metals contamination" evidence conditionally, so that it could make a finding in case this appeals court reversed its "proof limitation" order. After the parties introduced evidence, the district court concluded that EPA had not proved any "metals contamination" on the site. Rather, it concluded that the site, even before any contaminating activity took place, contained natural deposits of these metals. It found that EPA had failed to show any concentration of metals higher than the natural metal deposits that already existed.

We believe the record adequately supports both these conclusions.

1. *The proof-limiting order.* As we have just said, the court granted IMC's proof-limiting motion because it believed that to permit EPA to read its complaint to include a charge of "metals contamination" would unfairly surprise IMC. EPA attacks the lawfulness of the court's "proof-limiting" order by pointing to: 1) language in its complaint (other than in paragraph 42) which states in general terms that IMC (and others for whom it is responsible) released "hazardous" materials; 2) an instance, prior to Day 56 of trial, in which it introduced evidence of metal contamination; and 3) an effort by IMC's counsel, prior to Day 56 of trial, to cross-examine a witness about metal contamination. The first of these matters, the presence of general "contamination" language in the complaint, is beside the point. IMC's "proof-limitation" motion did not rest upon the literal language of the complaint. Rather, it rested upon the fact that a) the specific

list of five chemicals in the complaint, plus b) almost four years of pre-trial activity and fifty-five trial days without significant mention of its potential liability for metal contamination, plus c) the absence of any reason why the government failed to mention metals earlier, taken together, made it unfair to read the complaint to include metals or to permit a "metal-related" complaint amendment.

The second and third matters show little. The earlier instance in which the EPA told IMC about metals consists of its effort on *day 43* of trial to introduce evidence that a different defendant, Geochem (for whose actions IMC is *not* responsible), contaminated a different site, the O & G site (for which IMC is *not* responsible), with metal deposits—a claim that the court eventually rejected when it dismissed Geochem from the suit on the ground that no one (at that other site) had released metals. The earlier instance of cross examination by IMC consisted of its cross examination on *day 55* of trial, the day before it made its "surprise-based" motion.

■ The district court has adequate legal power to interpret general language in a complaint in light of what four years worth of legal activity indicates the parties mean by that language; and it can refuse to permit an amendment where such an amendment would unfairly surprise a party. *See, e.g., Isaac v. Harvard University,* 769 F.2d 817, 829 (1st Cir.1985); *Johnson v. Trueblood,* 629 F.2d 287, 294–95 (3d Cir. 1980), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Thus EPA's arguments fail to show that the district court here acted unreasonably or outside its lawful power.

■ 2. *No metal contamination.* In any event the record adequately supports the district court's substantive conclusion that there was no metals contamination. That conclusion rested upon its finding that a particular well dug on the land, well W–11, is a "background well," that is to say, a well that has not been contaminated by the waste site and thus reflects the natural state of the water. Well W–11 had water with high concentrations of several

of the relevant metals—concentrations that significantly exceeded drinking water standards. Thus, if W–11 is a "background" well, nature, not man, is likely responsible for high metal concentrations throughout the site.

EPA challenges only the first step of this reasoning. It denies that the district court could find that well W–11 was a "background" well. It points to what several documents introduced at trial show as very high metal concentrations, particularly of iron and arsenic, in well W–11. It says that these concentrations are much higher than those present at wells outside the dump sites but they are about the same as wells on the dump sites. *See* U.S.Exh. 634A (Ph. II). EPA also points to testimony of its expert, Dr. Sanborn, to the effect that well W–11 was not a background well, but rather was drilled for a special "bedrock test" purpose: although the slope of the ground is such that one might expect water to flow from the spot where well W–11 was drilled *toward* the dump site (thus suggesting that well W–11's site is "background"), if bedrock below well W–11 is *lower than* bedrock at the dump site, water may flow backwards along the bedrock, bringing contamination *to* well W–11. Dr. Sanborn also said he thought that well W–11's concentrations do in fact reflect such contamination, not background. *See* Tr. Day 22 (Ph. II) at 80–84.

The problem for EPA is that IMC points to other evidence that suggests the opposite. For example, U.S.Exhibit 448H.3 apparently compares levels of iron, nickel, arsenic and manganese at well W–11 with levels in wells W–16, W–17, and W–23 (all background wells), and also with levels in wells W–13 and W–14 (all dump site wells) and with various other wells. Some wells seem to have high concentrations of the metals; others have low concentrations— all without any obvious pattern. IMC also quotes a study done by an EPA contractor, which says that the "arsenic is more likely indicative of natural conditions in the area." U.S.Exh. 659 (Ph. II) at 5–12. The very report that speaks of well W–11 as having been dug to test bedrock levels concludes that "subsequent analysis ... does

not indicate" any flow of water from the dump site *towards* well W–11, U.S.Exh. 659 at 4–2; and maps of bedrock levels do not show the level differential for which EPA argues. Indeed, the very expert upon whom EPA relies testified earlier, and more vigorously, that well W–11 was indeed a background well.

We have read the hundreds of pages of tables of numbers to which EPA and IMC have referred us, with such guidance as the parties have provided in their briefs, keeping in mind the legal fact that EPA has the burden of persuading us that the district court's conclusion is "clearly erroneous." It has not done so. Thus, we find the district court's conclusions about metals to be lawful for this second, substantive, as well as for the first, procedural, reason.

### B

### *Volatile Organic Compounds (VOCs)*

The EPA claims that the district court should have ordered IMC to clean up the soil on the 5.88 acre GLCC site further in order to reduce the concentration of several volatile organic compounds (VOCs). The district court concluded that IMC's 1984 cleanup efforts reduced VOC concentration sufficiently, and that EPA itself should pay for any further VOC reduction efforts. EPA says 1) that the court should have measured IMC's efforts against EPA's "one part per million" VOC soil concentration standard, and 2) that, in any event, IMC failed to meet even the more generous "five to ten parts per million" standard that the court approved.

■ 1. *The standard.* After reviewing the briefs and the record pages cited, we cannot say that the district court *had* to conclude that "the public interest and the equities of the case," 42 U.S.C. § 9606(a), required it to adopt a "one" instead of a "five to ten" part per million standard governing VOCs in the soil. On the one hand, EPA points to the remedial conclusions of its own administrative proceedings and the expert evidence that underlay them. That evidence suggests that a "one part per million" standard would reduce the risk of

human cancer (from lifetime exposure) to close to one in a million. It would prove fairly easy to monitor compliance with such a standard. And applying so stringent a standard to the soil would also reduce the cancer risk caused by water running through the soil, picking up VOCs, and later entering a drinking water system.

On the other hand, IMC points out that the very report and expert study on which EPA relies says that a VOC level of 7 parts per million in the soil would reduce lifetime exposure cancer risks to one in a hundred thousand, a level that, in various contexts (including EPA's basic studies), EPA asserts to be its "goal." U.S.Exh. 375 at 21. Moreover, EPA monitored IMC's cleanup efforts, EPA was fully aware that IMC's method would reduce VOC soil concentrations to levels of five to ten parts per million, yet, at that time, EPA did not urge further cleanup. (*See* Tr. Day 59 (Ph. I) at 55, and EPA contractor note saying that the "clean excavated soil was effectively aerated," Tr. Day 63 (Ph. II) at 48.) IMC meets EPA's argument that lower VOC *soil* concentrations are now needed to protect against higher *water* concentrations by noting that the district court *separately* ordered run-off water cleanup to appropriately low levels. And it also says that the the special additional cleanup method (digging up, heating in a special machine, and then replacing about 14,000 cubic yards of soil) will cost an added several million dollars (IMC has already spent about $2.6 million), all for very little purpose (since one part per million is not significantly safer than five or ten).

There is simply no way for us to say, on the basis of this kind of general evidence, or on the basis of other highly general, tangentially related record material to which EPA refers, that the district court was wrong in its choice of standard. EPA must convince us of fact-related error, and it has failed to do so.

■ 2. *Compliance with the "five to ten parts per million" VOC standard.* The district court concluded that "there is evidence in some areas that ppms total of VOC levels exceeded substantially the norm," *but* "overall ... the IMC cleanup of the soil contamination substantially cleared up the VOCs." We take as the "norm" the "five to ten parts per million" that IMC says was its "goal." IMC's brief adds that "it is evident that the court accepted the propriety of IMC's target range of 5–10 ppm when it found that 'IMC ... substantially cleaned up the VOCs.'" And we shall hold IMC to its stated arguments, just as we have done with EPA. We therefore understand EPA to argue that the record does not permit the district court to find that IMC reduced VOC levels, overall, to "five to ten parts per million," even allowing for an occasional "hot spot" departure. We agree.

EPA points to two studies in the record, one conducted by an EPA contractor, the other representing an IMC contractor's "check" of the EPA contractor's sampling. After IMC finished cleaning up its site, the EPA contractor tested the results by digging a series of "test pits." It randomly dug 62 test pits, each about eight feet long, three feet wide, and eight feet deep, evenly spaced throughout an area somewhat larger than a football field. The contractor then took soil samples from different levels within each pit. It found that soil in over thirty of the sixty-two pits contained VOCs concentrated at levels higher than ten parts per million. Many samples were much higher than ten parts per million, and the high concentration samples appeared at different levels in many pits.

IMC makes two arguments in its effort to support the district court's conclusion. First, it says that EPA's contractor did not test the soil in a fair way. Rather, the contractor would use a meter to detect just where in the pit concentration was the highest; then, the contractor would take soil from that place. IMC's contractor testified that such a "hot spot" might be the size of "a softball." Tr. Day 46 (Ph. II) at 47. Since other evidence in the record suggests that a lifetime of exposure to VOC concentration of, say, seventy parts per million would produce a cancer risk of one in ten thousand, one might ask just how a scattering of such "softballs" throughout

the area could hurt. No one seems likely to suffer much from occasionally digging up some dirt mixed with a tiny amount of something like gasoline or benzene or turpentine; the court's other remedies should make certain that the groundwater flowing through the area stays clean; and, even if someone builds a house in the area and sinks a well, the small size of the "softball" would help assure that no significant amount of gasoline-like liquid mixes with the water.

The difficulty with this argument is that we cannot read the record as showing no more than the occasional "softball." IMC's contractor's own report indicates that *thirty-three* of the sixty-two wells have VOC concentrations that exceed ten parts per million (and, again, many of them exceed it by ten times or more). Although that report indicates, in respect to a few pits (pit 117, for example) that the "hot" area does not comprise the whole pit, the very fact that the contractor made notes stating, in respect to some pits, that the high concentration is found in only *part* of the pit, suggests that, where no such note exists, the high concentration area is fairly widespread within the pit. (The contractor testified that he would indicate in his notes whenever the "hot" area was significantly limited within a single pit. Tr. Day 46 (Ph. II) at 58–59.) The report suggests that high concentrations were limited to very small areas in only a few instances; indeed, nowhere does it indicate "softball-sized" areas; and in some instances (pit 121, for example) the report specifically notes that high concentrations exist throughout the pit (*e.g.*, 350 ppm at two feet deep, 340 ppm also at two feet, 400 ppm at four feet in one part of the pit and 606 ppm at four feet in another part). The contractor also testified that "in other cases [the "hot spot"] ... could be half a test pit," Tr. Day 46 (Ph. II) at 47; and he seems to have accepted a characterization of an "average" level of 87 parts per million as reasonable, *id.* at 112. Having read through *both* the "IMC" and "EPA" reports, and finding little conflict in this respect between them, we have a firm conviction that one cannot reasonably characterize the "over ten parts per million" VOC concentrations as "few" or "far between." Rather, the studies and related testimony indicate that such "over-standard" concentrations are widespread, and in significant amounts, within the total test area.

IMC also points to testimony suggesting that it would be wasteful to require IMC to dig up the several acre site again to process 14,000 or so cubic yards of soil. An IMC expert testified that, even if nothing further is done, by the year 2000 probably more than half of the VOCs in the soil would have diffused into the atmosphere. Tr. Day 48 (Ph. II) at 43–44. Moreover, VOCs released into the groundwater will be taken care of by the groundwater treatment ordered by the court. Since IMC's $2.6 million dollar expenditure has brought us so near absolute safety, why force expenditure of millions of dollars more to buy so little?

The problem with this second argument is that the court expressed no view about its validity or direct relevance. Rather, the court's opinion assumes (as IMC and EPA both read it) that "five to ten parts per million" is the appropriate standard, and it goes on to say that IMC has substantially complied. We, too, therefore, express no view about this second kind of argument, except to note that the district court did not adopt it. Thus, we remand this aspect of the case to the district court so that it can devise a further VOC cleanup remedy, which, in light of its findings about danger to the public health, will adequately satisfy "the public interest." 42 U.S.C. § 9606(a).

C

*PCBs*

EPA also asked the district court to order a cleanup of soil and sediments at the waste site to reduce to safe levels the concentration of a carcinogenic chemical, PCB. The court applied a standard of 50 parts per million for soil concentration, which it determined IMC's 1984 cleanup had met, and a standard of 20 parts per million for sediment concentration, which it ordered IMC to meet. EPA now argues that the

standards are too lenient; it says that the court should have selected a soil standard of 20 parts per million and a sediment standard of one part per million, and that, in any event, the soil cleanup did not meet the court's own 50 ppm standard. After examining the record, however, we find adequate legal support for the court's conclusions.

■ 1. *The soil standard.* The evidence that EPA offered to show that the soil PCB cleanup should reduce concentrations to *at least* fifty parts per million is strong. EPA pointed to a Toxic Substances Control Act regulation that insists (for TSCA purposes) upon incineration (or storage in special dumps) of soil with PCB concentrations greater than that. 40 C.F.R. 761.60. Of course the TSCA standard does *not* say that soil with *less* than 50 PCB parts per million is safe. Nonetheless, the evidence that EPA offered in support of its lower, 20 ppm, standard is weak. The 20 ppm evidence consists almost entirely of a two page calculation prepared by an EPA expert, Dr. Tsai (and Dr. Tsai's explanatory testimony). In her calculation, Dr. Tsai makes clear that her conclusion—that only 20 ppm (or lower) PCB concentrations will achieve EPA's cancer goal (a lifetime cancer risk of less than one in a hundred thousand)—rests upon her assumptions that a) developers will build residential housing on the site, b) small children, playing in the backyard, will eat dirt containing PCBs, and c) the children will eat a little bit of dirt each day for 245 days per year for three and a half years (about six ounces altogether, as we calculate it).

At the same time, IMC produced witnesses that suggested that residential development was unlikely, Tr. Day 45 (Ph. II) at 73, 92; it noted that Dr. Tsai's calculation also indicated that concentration levels as high as 70 ppm might be safe (if the children ate the dirt on only 70, rather than on 245, days per year); and it obtained testimony from EPA project manager Hohman that, in context, makes it seem as if EPA was uncertain just where to draw the line between a 70 ppm standard and a 20 ppm

standard (though TSCA constrained EPA to urge a standard of 50 ppm or less). Tr. Day 41 (Ph. II) at 64–65. IMC also noted that EPA was fully aware that IMC's own cleanup plan called for PCB reduction to 50 ppm, that EPA, at one point, called the plan "extremely commendable," that EPA employees, contractors or officials were present throughout IMC's cleanup, and that EPA (while not binding itself to accept IMC's cleanup as sufficient) nonetheless said nothing at the time about reducing PCB levels further. Finally, IMC's brief, and EPA's studies, make clear that IMC's cleanup, reducing PCB and VOC soil levels to 50 ppm and 10 ppm respectively, cost about $2.6 million; to reduce those levels further, to 20 ppm PCBs and 1 ppm VOCs, will cost an additional $9.3 million. One might conclude from the cited portions of the record that this amounts to a very high cost for very little extra safety.

On balance, after reading the cited portions of the record, we have no "firm conviction," *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), that the district court's determination was wrong; its factual conclusions do not seem "clearly erroneous," nor its judgment unreasonable. We cannot say that the "public interest and equities of the case" require a stricter standard than the court applied.

■ 2. *Implementation of the soil standard.* EPA argues that IMC's cleanup did not meet even the 50 ppm PCB standard. Its evidence that this is so consists of analyses of soil samples taken from soil several feet below the surface in five of the 63 test pits. Three samples exceeded 50 ppm (56, 134, and 143 ppm, respectively). U.S. Exh. 445A (Ph. II) at table 45. The explanatory testimony to which EPA also points, however, indicates that these samples were not taken randomly. Rather the five samples were taken from areas where the experts found "discolored soils." That being so, one might reasonably conclude that EPA could find evidence in only three of the 62 test pits of PCB concentrations that exceed the standard. (Although EPA's expert also said that there were

other areas of "discolored" soils, he did not make clear how many there were, where they were, whether they were outside the five test pits from which the samples were taken, or whether they more likely reflected the "more than 50 ppm" present in the three noncomplying "discolored soil" samples, or the "less than 50 ppm" present in the two other "discolored soil" samples.) In our view, the areas of noncompliance are sufficiently small in number to warrant a conclusion that the likelihood that a child would eat this soil, consistently over a period of many days or years, is virtually nonexistent; and, the very occasional patches of below-surface noncomplying soil would seem sufficiently scattered to warrant a conclusion of no significant risk. We cannot say that the district court was "clearly erroneous" or unreasonable in reaching such a conclusion, and we therefore find no legal error.

3. *PCB "sediment" standard.* The district court required IMC to clean the marsh and the south brook to the point where PCB concentration in the sediments would not exceed 20 parts per million. EPA argues that the standard is too lenient. It says that the court should have imposed a standard of one part per million PCBs.

The EPA supports its argument with citations to only a handful of statements. Its own administrative report simply says in highly general language that there should be a standard of one part per million in order to protect birds, fish, and mammals, as well as human beings. U.S. Exh. 375 (Ph. II) at 25. The study upon which the EPA based its report offered several alternative remedies, only one of which recommended that same standard for that same reason. U.S. Exh. 450A (Ph. II) at 22. And Dr. Tsai testified that she chose that same standard, again, for the same reason.

IMC correctly points out, however, that the study upon which EPA based its report also, in another alternative remedy, recommended a sediment PCB standard of 50 ppm. U.S. Exh. 450A at 63. It points to a discussion in the record of a federal fish and wildlife study that finds no "significant health risk" at the pond, despite the potential 20 ppm PCB sediment concentrations. And it adds that EPA has nowhere explained how, or why, animal and human protection requires a more stringent standard. Indeed, out of the entire record, EPA mentions only a handful of highly general, conclusory sentences about the PCB sediment standard. (*E.g.*, the EPA's basic study simply says without elaboration, that the "action level of 1 ppm for PCB's in sediments was selected after discussions with State and federal officials because of the potential for bioaccumulation of these PCB's by wetland biota." U.S. Exh. 450A at 22.) The only more concrete explanation given is that of Dr. Tsai, who, after repeating the same general conclusory sentence, added that EPA considered a "two parts per million" standard for concentration in fish. But Dr. Tsai did not explain the relation between PCB concentration in the sediment at the bottom of a pond and concentration within a fish.

In our view, the district court was entitled to hold EPA to somewhat higher standards of detailed proof than those met in the pages we have cited. And, in the absence of that proof, given the other (also skimpy) indications in the record that less stringent "alternatives" would be adequate, we believe the court could reasonably choose a 20 parts per million standard. That is to say, we cannot find that such a standard is "clearly erroneous" or its choice unreasonable.

### III

#### *Other Issues*

1. *EPA "joint and several" liability.* The district court specifically ordered IMC to carry out "EPA's selected groundwater remedy," *i.e.,* the work necessary to clean up the groundwater at the GLCC site. 694 F.Supp. at 987, 1006. At the same time, the district court wrote that water, contaminated with waste at the O & G site a few hundred yards northwest, flowed under the GLCC site to the southeast, and mixed at some point with water from the GLCC site. Because (in the district court's view) EPA's own "cleanup" operation at the northern O

& G site played a major role in contaminating that site, the court said that EPA was in part responsible for some GLCC groundwater contamination. It said:

GLCC and IMC are also jointly and severally liable [with respect to dirty groundwater under the GLCC site] *with ... the EPA.*

694 F.Supp. at 987 (emphasis added). EPA, concerned that the court would say that it was partly liable, asks us to reverse this finding.

EPA concedes that the statute permits a court to find the government itself liable for a release of hazardous waste. *See* 42 U.S.C. § 9620(a)(1). It points out, however, that IMC did not file a claim or counterclaim against it, it points to various statutory provisions suggesting certain exemptions, 42 U.S.C. § 9607(d)(1), and it says that the evidence will not support a finding that its O & G site cleanup activity produced any significant amount of contaminated groundwater under the GLCC site. IMC argues, to the contrary, that the factual findings have adequate support. It adds that the court could also find EPA liable because EPA entered into a consent decree related to the O & G site, in which EPA seems to promise to bear 40% of the costs of "remedial action to be undertaken for the groundwater ... contamination present on or under the Ottati & Goss Site (or resulting therefrom)...."

■ We shall not resolve this argument on this appeal. As far as we can tell, the court's "liability finding" has no practical effect in respect to the judgment of the district court that is here before us under review. EPA has not pointed out any way in which this "liability" finding has made any difference, either to the specific relief that the court ordered in its judgment or to the money or costs that it awarded. As far as we can tell, EPA simply fears that this "finding" might collaterally estop it someday from defending itself should IMC bring a different legal action seeking an EPA "contribution" to its groundwater cleanup costs. *See* 42 U.S.C. § 9613(f) ("Any person may seek contribution from any other person who is liable or potentially liable

under section 9607(a).") Since the finding is not, in any sense, necessary to the judgment, we do not see how it could "collaterally estop" the parties in any future action. *See* Restatement (Second) of Judgments § 27. And we specifically so hold. Given the lack of practical effect, and hence our uncertainty about the meaning of this finding, any appeal is premature. *Cf. Bath Iron Works Corp. v. Coulombe,* 888 F.2d 179, 180 (1st Cir.1989) (per curiam) (party cannot appeal from dicta).

EPA also wants to appeal a statement in the district court's liability opinion that "IMC is not responsible for or liable for any releases into the environment or effects upon the public health or environment from 1955 until May, 1973" (when it bought the GLCC site from a company called Kingston Steel Drum). 630 F.Supp. at 1374. We cannot decide this EPA claim for the same reason: EPA does not explain how this statement makes any practical difference to the judgment under review, or how it is in any sense necessary to the district court's judgment.

2. *Liability for EPA's "indirect costs."* The district court awarded, to EPA, to the State of New Hampshire, and to others, costs that they incurred in helping to clean up the sites—costs for which IMC, in part, was responsible. 42 U.S.C. § 9607(a). In awarding costs to EPA, the district court specifically disallowed $336,922, stating:

$336,922.00 are indirect costs which include expenses for rent, utilities, supplies, clerical staff and other overhead expenses. These indirect costs necessary to operate the Superfund program cannot be attributed directly to the O & G/GLCC sites, and are therefore disallowed.

694 F.Supp. at 995. Subsequently, responding to EPA's motion to reconsider the point, the court wrote:

There is ample evidence of record why this court allowed the State of New Hampshire's indirect costs and disallowed indirect costs of the United States. To add further fuel to the fire, the United States has the temerity to state there is no reason for its ustulation [i.e., being

"burned"] by the court. Without reiterating what is self-evident, the cavalier and hubristic actions of EPA in this litigation warrant the use of punitive measures by the court. This litigation appears to be interminable and this ruling may be considered a harbinger if future court hearings are necessitated relative to monitoring.

694 F.Supp. at 1004. Elsewhere, when discussing its decision to deny the United States prejudgment interest, the court wrote:

> The United States has on many occasions since it commenced litigation on May 15, 1980 done the following: ignored court orders, delayed the progress of this case, resulting in sanctions being imposed in the liability phase, attempted to recoup the amount of the sanctions in this phase of the trial, led the court to assume it had authority to settle when it had none, at the time making a mockery of a settlement conference, when former defendant, Geochem's motion to dismiss was granted, attempted to recover sums expended in that segment of the litigation against the remaining defendants and a general insouciance about judicial time with general oblivion to the demands of time on the defendants.

*Id.* at 998.

EPA, pointing to cases involving comparable cost awards, argues that the law requires the district court to award it "administrative overhead," *i.e.*, a proportionate share of rent, utilities, administrative staff costs, etc., that are not readily allocable to one specific, rather than some other specific, cleanup site. *See, e.g., United States v. Northernaire Plating Co.*, 685 F.Supp. 1410, 1419–20 (W.D.Mich.1988) (declining to follow *Ottati & Goss* district court, which "gave no further explanation for its decision to deny indirect costs"), *aff'd sub nom., United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1502–03 (6th Cir.1989) ("indirect costs are part and parcel of all costs of the removal action"); *United States v. Mottolo*, 695 F.Supp. 615, 631 (D.N.H.1988) (awarding all government costs, including administrative costs); *cf. United States v. Hollywood Marine, Inc.*, 519 F.Supp. 688,

691–92 (S.D.Tex.1981) (awarding government indirect costs under Clean Water Act). IMC does not deny that *ordinarily* EPA should recover indirect costs; rather, it says that the district court denied those costs as a sanction for improper behavior, a sanction that the law permits the court to assess. *See* Fed.R.Civ.P. 16(f), 37(b); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (court has "inherent power" to levy sanctions in response to "abusive litigation practices"); *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11–12 (1st Cir.1985) (court's inherent powers permitted entry of default judgment against party for abuse of discovery process), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986).

 We agree with EPA that ordinarily courts should allow recovery of these indirect costs. We also agree with IMC that the district court denied these costs as a sanction, that district courts ordinarily have the legal authority to impose such sanctions, *see Roadway Express, supra*, and that the record raises serious questions related to the effective administration of environmental protection laws. Why, for example, has this case taken ten years to litigate? The issues are complex, but not unfathomable. Why has the government not found a way to express its technical problems in English (*e.g.*, "small children will eat tiny amounts of dirt when they play in a yard"), instead of relying upon mazelike patterns of cross-references among regulations, statutes, and "expert jargon"? Has the government itself caused a significant amount of contamination through negligent cleanup efforts? Has the government, in fact, spent enormous administrative (and judicial) resources in an effort to force improvement from "quite clean" (10 ppm VOC, and 50 ppm PCB) to "extremely clean," at three to four times the "quite clean" costs? Indeed, has the government taken account of the fact that preparing briefs and then asking an appeals court to work through such a maze, in the face of a forty or fifty thousand page record, takes considerable

time that its lawyers might devote to other cases, or the courts to other litigants, and has it consciously decided that determination of this primarily site-, case- and fact-specific appeal is significant enough to warrant such calls upon public resources?

To find a case worrying, however, to believe that "there must be a better way," to wonder about the government's priorities in the face of other, apparently more serious, environmental demands for "clean-up" time and effort—is not to find the type of governmental activity that may call for sanctions. And the parties hotly contest the existence and the unreasonableness of each specific instance of misconduct that arguably calls for sanctions. (The government, for example, says that IMC's claim that it "was barred from discussing settlement with the government" is "false;" while IMC replies that its claim "is true," and "it is wrong for EPA to label as false a statement that some of its own lawyers know to be true.")

We simply cannot determine from this vast record just what it is that EPA or its lawyers may have done that is wrong and warrants the sanction of denying indirect costs; and, we do not want to guess, in so serious a matter, just what is in the district court's mind. We therefore remand the case on this issue for the court to redetermine the "sanctions" matter, after which, if it assesses sanctions, it will state the specific factual, and legal, basis upon which they rest, including the reason to equate the amount of the sanction with the amount of the indirect costs.

### Conclusion

For the reasons stated, we order the district court to do the following: 1) The court will reconsider its order in respect to VOC cleanup; it will amend that order to require IMC to clean up VOCs in the soil at the GLCC site to a level that it determines "public health" and the "public interest" require. 2) The court will reconsider the matter of "indirect costs," explaining, as we have set forth above, any denial of those costs as a sanction. In all other respects the judgment of the district court is affirmed.

*Affirmed in part, vacated in part, and remanded for further proceedings indicated in this opinion.*