**WAGNER SEED COMPANY, INC., Appellant,**

v.

**George BUSH, as President of the United States of America, et al., Appellees.**

No. 89–5139.

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1990.

Decided Oct. 15, 1991.

As Amended Oct. 15, 1991.

---

that the reimbursement provision of the statute does not apply to Wagner because the Congress passed it after Wagner had received the EPA clean-up order. Wagner then sued.

The district court dismissed the case, holding first that the EPA's is a permissible interpretation of the statute to which the court must defer under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and second that in any case the tenets of statutory construction favor the EPA's reading. *Wagner Seed Co., Inc. v. Bush,* 709 F.Supp. 249, 252 (D.D.C.1989). We conclude that the statute is ambiguous as to whether reimbursement is available to a party that received a clean-up order prior to enactment of the statute; we affirm, however, because like the Seventh Circuit, *see Bethlehem Steel Corp. v. Bush,* 918 F.2d 1323 (7th Cir.1990), we believe that the EPA's interpretation of the relevant provision, resolving that issue against reimbursement, is reasonable.

Frank L. Amoroso, New York City, with whom Albert Shuldiner and Neal J. Cabral, Washington, D.C., were on the brief, for appellant.

Letitia J. Grishaw, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., J. Carol Williams and Angus E. Crane, Attys., Department of Justice, Washington, D.C., were on the brief, for appellees.

Before BUCKLEY, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

D.H. GINSBURG, Circuit Judge:

After complying with a clean-up order issued by the Environmental Protection Agency under the so-called Superfund law, Wagner Seed Company sought reimbursement of its expenses from the agency. The EPA denied Wagner's claim, concluding

I. FACTS

In December 1985, the EPA issued a clean-up order, under § 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9606(a) (1982), requiring Wagner immediately to remove hazardous substances that had been released when a fire caused by lightning destroyed its warehouse. Wagner sought to enjoin enforcement of the order, but its motion for a preliminary injunction was denied by a district court, *Wagner Seed Co. v. Daggett,* C.V. No. 86-0097 (E.D.N.Y. Jan. 27, 1986); the Second Circuit affirmed, 800 F.2d 310 (1986), holding that CERCLA does not provide for pre-enforcement review, *see id.* at 314–15. Wagner then carried out the required clean-up.

By October 17, 1986, Wagner had substantially completed the clean-up. (The Government asserts, and Wagner does not dispute, that it had by then expended 98% of its ultimate clean-up costs.) On that date, the Congress passed the Superfund

Amendments and Reauthorization Act of 1986 (SARA), Pub.L. No. 99–499, 100 Stat. 1613, which amended CERCLA by adding, *inter alia,* the following provision:

> Any person who *receives and complies* with the terms of any order issued under subsection (a) of this section may, within 60 days after completion of the required action, petition the President for reimbursement from the [Superfund] for the reasonable costs of such action, plus interest.

§ 106(b)(2)(A), 42 U.S.C. § 9606(b)(2)(A) (emphasis added).

In January 1988, the EPA certified that Wagner had complied with the clean-up order, and within 60 days Wagner petitioned for reimbursement under § 106(b)(2)(A), on the ground that the release of hazardous materials was caused by an act of God. *See* § 101(1), 42 U.S.C. § 9601(1). In June 1988, the agency rejected Wagner's claim in a letter holding that the reimbursement provision of SARA, § 106(b)(2), applies only to clean-up orders received after the Congress adopted that provision. *See* Letter from J. Winston Porter, Assistant Administrator for Solid Waste and Emergency Response 3–4 (June 9, 1988). Wagner then instituted this suit, as authorized by § 106(b)(2)(B).

Wagner asserts that the EPA erred in interpreting the phrase "receives and complies" in § 106(b)(2). As Wagner reads the statute, it requires only that an order have been received and complied with by the time reimbursement is sought. The crux of its dispute with the EPA, therefore, is whether the Congress intended the term "receives" to apply retrospectively or only prospectively from the date the statute was adopted.

## II. STANDARD OF REVIEW

■ Because this dispute involves the meaning of a statutory term interpreted by the government agency with authority to administer the statute, we first consider whether we are free to construe the term independently or owe deference to the agency's interpretation. Preliminarily, we note that although § 106 vests initial authority in "the President" and not in the EPA, the President has delegated his authority under § 106 (and under much of CERCLA) to the EPA, as authorized by 42 U.S.C. § 9606. *See* Exec.Order No. 12,580, § 4(d)(1), *reprinted in* 42 U.S.C.A. following § 9615. That delegation is sufficient to render the EPA the administering agency for purposes of *Chevron. See Eagle–Picher Indus. v. EPA,* 759 F.2d 905, 909 n. 9, 920 (D.C.Cir.1985) (deferring to the EPA because it "has been entrusted [by the President] with the administration of CERCLA").

■ Under *Chevron,* when the court is presented with an interpretation of the statute by the agency that administers it, and "the statute is silent or ambiguous with respect to the specific issue," then the court must defer to that interpretation if it is reasonable. *See Mead Corp. v. Tilley,* 490 U.S. 714, 722, 109 S.Ct. 2156, 2161–62, 104 L.Ed.2d 796 (1989); *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987); *American Mining Congress v. EPA,* 824 F.2d 1177, 1182 (D.C.Cir.1987). The controlling principle of *Chevron* is that when the statute, viewed in light of its legislative history and the traditional tools of statutory construction, is ambiguous, the administering agency is entitled to make "a reasonable policy choice," 467 U.S. at 843 & n. 9, 845, 104 S.Ct. at 2781 n. 9, 2783. Before we address the issue of whether the statute is indeed ambiguous, we consider Wagner's several arguments against the application of *Chevron* deference.

*First,* Wagner contends that *Chevron* is inapplicable because the statute gives it a *de novo* right of action in district court, rather than remitting it to a proceeding merely for judicial review of agency action. In this vein, Wagner points out that the statute requires a party seeking reimbursement to prove "by a preponderance of the evidence" that it is not liable for the cost of complying with the EPA's clean-up order. 42 U.S.C. § 9606(b)(2)(C). Wagner argues that for a court to review *de novo* the EPA's factual findings on liability under

that standard, only to defer under *Chevron* to the EPA's interpretation of the law, would invert "the traditional standard for judicial review of administrative actions," in which the court affords to the agency greater deference on issues of fact than on issues of law. The implication is that the Congress should not be thought, absent explicit direction, to have intended such a radical departure from "tradition."

■ The issue for the court is not whether Wagner is liable under the standard of paragraph (b)(2)(C), but whether Wagner is "a person who receive[d] and complie[d]" with an order (as those terms are used in paragraph (b)(2)(A)), which status is a prerequisite to seeking reimbursement. Wagner's contention that all issues are to be determined *de novo*, and that the judicial action must proceed without regard to the EPA's administrative decision, is absurdly rigid, departing from common sense as well as from "tradition." For if Wagner were correct, then the court would not defer either to the EPA's determination whether a party has "complied" with the agency's clean-up order. It would be truly bizarre, however, for a court to determine *de novo* that issue, which may involve both technical and policy questions within the expertise of the agency. That a private party whose claim has been considered by an administrative agency has a right to a trial *de novo* on issues of fact simply does not mean that the court will deny deference to the agency on an issue of statutory interpretation. *See Chandler v. Roudebush*, 425 U.S. 840, 843, 864, 96 S.Ct. 1949, 1961, 48 L.Ed.2d 416 (1976) (right to trial *de novo* without deference to EEOC's findings of fact); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971) ("The administrative interpretation of the Act by the enforcing agency [EEOC] is entitled to great deference.").

*Second,* Wagner draws an analogy between the present action and an action brought under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, in which the agency's decision to deny a claim is accorded no deference. The FTCA and § 106(b)(1) are indeed similar in one respect: the presentation requirement in the former, 28 U.S.C. § 2401(b), and the petition requirement in the latter, oblige the plaintiff first to have given the defendant agency an opportunity to resolve the dispute without a lawsuit. The two regimes differ, however, in a way more material to the *Chevron* question: the many agencies covered by the FTCA are by that law merely authorized to process and pay tort claims; in contrast the EPA, acting under CERCLA, is charged with the administration of a complex regulatory scheme. The latter agency alone may therefore lay claim to the administrative policy discretion necessarily attendant to that task.

*Third,* Wagner argues that *Chevron* deference is not in order because the EPA issued its prospective-only interpretation of § 106(b)(2) in a decision letter, "without a hearing, without the use of an administrative law judge, without briefing, and, indeed, without demonstrating any consideration or analysis of the issues raised by Wagner['s] claim." "Such a blind process," we are told, "makes the EPA's position merely 'interpretive,' and not entitled to the deference accorded 'legislative' rulemaking."

At the outset, we wish to be clear that we do not accept Wagner's premises that the agency's decision process was defective and that it gave no consideration to the issues involved, a claim that is at best hyperbolic. It may well be that the greater the procedural trappings that attend an agency's interpretive moment, the less reason for judicial concern that the interpretation was off-handed or opportunistic, susceptible to discard tomorrow when another permissible interpretation better suits the agency's needs of the day. Likewise, the opinion of a low-level bureaucrat, given in a non-adversarial or informal context, may or may not be deemed sufficiently relevant to the agency's administration of the law to warrant deference under *Chevron;* but that is not at all the case before us.

The EPA's interpretation of § 106(b)(2) was given after due consideration in order to resolve an important and recurring mat-

ter before it. The decision letter under review poses the question whether retroactive application to Wagner is authorized or appropriate, considers the legislative history of the statute, and upon analysis describes its purpose as the creation of an incentive to comply with agency clean-up orders. Furthermore, the agency has applied this interpretation consistently. *See Bethlehem Steel*, 918 F.2d at 1325 (EPA had reached same conclusion one month prior to decision letter in this case); *Gary Steel Supply Co. v. Reagan*, 711 F.Supp. 471, 473 (N.D.Ill.1989) (considering another like decision issued three months after agency decision in this case; court deferred to agency interpretation).

In any event, it simply is not the law of this circuit that an interpretive regulation does not receive the *Chevron* deference accorded a legislative regulation. *See Theodus v. McLaughlin*, 852 F.2d 1380, 1383–84 (D.C.Cir.1988); *see also Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1496–97 (D.C.Cir.1988) (deference due to a permissible agency interpretation whether it arises out of rulemaking or adjudication).

Seeking post-*Chevron* authority for its position, Wagner relies principally upon *Doe v. Reivitz*, 830 F.2d 1441, 1445–47 (7th Cir.1987), *amended*, 842 F.2d 194 (7th Cir. 1988), which held that a lesser degree of deference is owed to an "agency interpretation" than to the "high-powered" legislative type of regulation to which the Court deferred in *Chevron*. The vitality of *Reivitz* is unclear, however—except in the present context. For when the Seventh Circuit considered the very EPA interpretation now before us, it deferred pursuant to *Chevron*, rejecting the argument that the courts should give less deference to an "interpretive ruling" than to a "legislative ruling," *Bethlehem Steel*, 918 F.2d at 1327 n. 3 (relying upon, among others, *Midtec Paper Corp.*, 857 F.2d at 1496–97, and *Theodus*, 852 F.2d at 1382–84). Thus, whatever *Reivitz* means, the Seventh Circuit itself does not believe that it means that the EPA's interpretation of the statute in this case should receive less than the usual deference due under *Chevron*.

*Fourth*, Wagner suggests that we should not defer to the EPA's interpretation of § 106(b)(2) because the reimbursement action it sets up is intended to provide redress where the agency has "made a mistake," *i.e.*, issued a clean-up order to a party that is not liable. We take Wagner's point to be that the agency will be reluctant to admit having made a mistake—and what bureaucracy is not? The question, though, is whether the agency will therefore give too narrow a reading to the statute.

Wagner's point would have real force as applied to the agency's particularized decision respecting liability; indeed, that may well be why the Congress provided for *de novo* judicial review of that type of decision. We deal here, however, with a broader question of statutory interpretation. It is fortuitous that this question arises as a potential bar to recovery by Wagner and, apparently, a few other parties whose notice and compliance straddled enactment of SARA. True, under one interpretation of § 106(b) the agency may avoid the necessity to decide whether, in the affected cases, it erred in issuing its original clean-up order. That is surely too slight a gain, however, for the court to consider the agency an interested party whose interpretation is therefore not to be accorded the deference ordinarily due to the agency with responsibility for administering the law.

*Fifth*, Wagner contends that because this dispute concerns a "pure question of statutory interpretation," no deference is due to the EPA. In this regard, it relies upon certain decisions of this court that were superseded by the *Food Workers* case, 484 U.S. at 123, 108 S.Ct. at 420–21. The Court there confirmed that judicial deference is owed to the agency under step two of *Chevron* even when the only ambiguity involves "a pure question of statutory interpretation." *See id.* at 133–34, 108 S.Ct. at 426 (Scalia, J., concurring); *Theodus*, 852 F.2d at 1382–83, 1386–87 (D.C.Cir. 1988).

■ *Sixth*, Wagner argues that the question of retroactive application *vel non* is inappropriate for administrative determi-

nation because its resolution "is devoid of political or technical considerations." *Chevron* admits of no such limitation, however. As a practical matter, resolution of an ambiguity in a statute, if it has consequences, inevitably requires the agency to consider competing policy objectives; it is the reconciliation of such conflicts that is entitled to judicial deference under *Chevron*, 467 U.S. at 865, 104 S.Ct. at 2793.

Here, the EPA views its task as efficiently to use the scarce resources available to it in order to provide an incentive for a potentially responsible party to undertake a response action—a view deserving of special deference because the agency played an important role in the legislature's development of SARA, *see Bethlehem Steel*, 918 F.2d at 1328. When measured against that purpose, either of the two interpretations being advanced involves an imperfect fit. Wagner's interpretation, which would entail compensating those who had completed such action at the time the statute was passed, is overinclusive; the EPA's interpretation, which would deny compensation to those who had received an order but (unlike Wagner) had not made substantial clean-up efforts at the time of passage, is underinclusive. In these circumstances, the agency's decision as to which interpretation brings about the better allocation of resources is a policy judgment, and as such it is entitled to *Chevron* deference.

*Additionally*, after this case had been argued, the Supreme Court decided *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990), and we invited the parties to submit supplemental briefs on the relevance of that decision to this case. In *Adams Fruit*, employees sued their employer for injuries they allegedly suffered when the employer intentionally violated the motor vehicle safety provisions of a federal worker protection statute. The employer, relying in part upon the Labor Department's interpretation of the statute, argued that the state workers' compensation law provided the exclusive remedy. In the course of rejecting that argument, the Supreme Court held that even if the federal statute was ambiguous on this point, the Labor Department's interpretation of the statute was not entitled to deference: the Congress had given the Department a role in administering the statute, requiring the Secretary to promulgate standards implementing the motor vehicle provisions, but it had not delegated to the Department the power to "regulate the scope of the judicial power vested by the statute." *Id.* 494 U.S. at ——, 110 S.Ct. at 1391.

Under the reimbursement scheme of SARA, by contrast, interpretation of the "receives and complies" requirement of § 106(b)(2)(A) is the agency's responsibility in the first instance. In interpreting this language, therefore, the EPA was not overstepping its proper administrative role in order to "regulate the scope of the judicial power" in a private cause of action. *See also Food Workers*, 484 U.S. at 123, 108 S.Ct. at 420–21 (*Chevron* deference applied where agency's interpretation had effect of precluding judicial review). On the contrary, as we have just seen, it was making a decision about the best allocation of the scarce resources made available by the Congress for the purpose of providing an incentive for clean-ups that might not otherwise be undertaken by a potentially responsible party. If the EPA had purported to determine the manner in which a person seeking reimbursement must "file an action," or which is "the appropriate United States district court" under § 106(b)(2)(B), the paragraph creating the cause of action, the rationale of *Adams Fruit* would seem to apply. *See also United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 434 (1st Cir. 1990) (court not legally bound by first sentence of § 106(a) to enter the remedial injunction that EPA non-arbitrarily thinks proper). Because the EPA is obliged, however, to rule upon the meaning of the terms of § 106(b)(2)(A) in response to a petition for reimbursement, and in doing so must resolve the policy issue raised by the petition, it can hardly be rebuffed, when it later asserts its claim in court to deference under *Chevron*, for trying to "bootstrap" itself into an area in which it has "no jurisdiction." *Cf. Adams Fruit*, 494 U.S. at ——, 110 S.Ct. at 1390–91.

### III. Application

Having determined that *Chevron* applies, we ask first whether "the intent of Congress is clear." 467 U.S. at 842–43, 104 S.Ct. at 2781–82. If we can, by "employing traditional tools of statutory construction, ascertain[ ] that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843, 104 S.Ct. at 2782.

Each party contends that the plain language of the statute unambiguously supports its position. By its terms, § 106(b)(2)(A) provides a remedy for "[a]ny person who receives and complies" with a clean-up order. The EPA reads this phrase to refer only to a person who receives an order after the statute was enacted. Wagner sees in it the Congress's intent to reimburse any entity that ever received or receives an order, so long as it petitions for reimbursement within 60 days of completing its compliance with that order. The issue thus joined is whether the statute, which lists two conditions ("receives and complies") that must be satisfied by a party prior to petitioning for reimbursement, applies to a party that had satisfied the first condition before the statute was adopted.

■■■ The obvious starting point for interpretation is the presumption against retroactivity: "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). If the presumption against retroactivity is not rebutted by clear terms to the contrary—and none is to be found in § 106—then the statute applies only prospectively. *See, e.g., United States Fidelity & Guaranty Co. v. United States*, 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908) (a statute "ought not to receive [retroactive] construction unless the words used are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied").

■■■ Wagner asserts that it is not a matter of retroactivity to apply the statute to a claim that did not accrue until after the statute was adopted—*viz.* when Wagner completed its compliance with the clean-up order. If Wagner is correct, then the rule against retroactivity precludes the application of a new statute to a case that could have been brought before the statute was adopted, but is not relevant where some but not all elements of the claim predate the statute. *See Reynolds v. United States*, 292 U.S. 443, 448–49, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934) ("A statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment."); *Shwab v. Doyle*, 258 U.S. 529, 534–35, 42 S.Ct. 391, 392, 66 L.Ed. 747 (1922) ("laws are not to be considered as applying to *cases* which arose before their passage unless that intention be clearly declared") (emphasis added); *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 1583, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) ("It is at least arguable that it does not constitute retroactive application to apply a provision dealing with the award of costs or fees in litigation to all litigation that has not yet terminated when the provision takes effect.").

The Government does not rebut Wagner's argument, and we find no direct authority to resolve the issue it has raised. Thus, we reject the EPA's claim to ownership of the plain language of the statute.

Wagner's claim to the plain language of the statute turns out to be just that § 106(b)(2)(B) is a remedial provision to be liberally construed, *see, e.g., Bell v. Brown*, 557 F.2d 849, 853 (D.C.Cir.1977). If the language of the statute were plain enough, of course, Wagner would not be invoking a canon of liberal construction; but under *Chevron* the language need not be pellucid without the aid of a special lens in order for Wagner to prevail. We need only be able, with the application of "traditional tools of statutory construction," to discern a congressional "intent[ ] on the precise question at issue." The 'rule' of construc-

tion upon which Wagner relies, however, is little more than a 'thumb on the scale' in the uncertain category of cases to which it applies; unlike, for example, the rule of *ejusdem generis*, it cannot supply a precise meaning to an otherwise ambiguous text. Thus, the rule in question cannot supply the specific congressional intent that *Chevron* requires.

Nor is legislative history helpful in resolving the issue. The EPA cites a statement made by Rep. Eckart:

> [Section 106(b)(2) ] is intended to provide incentives for parties to undertake the work required in the order, even [if] they have legal objections to performing the work. Thus, effective after the date of enactment of these amendments, a party who receives an order can begin the work of environmental cleanup while preserving its right to raise objections in a subsequent proceeding.

132 Cong.Rec. 29779 (1986). We agree with the district court, *see* 709 F.Supp. at 251 & n. 2, that this statement is too general to evince the specific intent to preclude recovery where the cleanup comes after the effective date of the statute. We note, on the other hand, that nothing in the legislative history indicates an affirmative intention to allow recovery where the order was issued before the effective date of the statute.

The traditional tools of statutory construction thus provide us no plain and unambiguous answer to the question whether the Congress intended § 106(b)(2) to apply to any person who had already received a clean-up order when it was enacted; therefore under *Chevron* we must accept the agency's interpretation if it is merely permissible. The EPA's construction of the statute is clearly a reasonable one: it is consistent with the Congress's objective of providing an incentive for any potentially non-liable party to begin a clean-up, and it deals in a reasonable, albeit not a compassionate, way with anyone who was unfortunate enough to have received a clean-up order before the Congress made provision for reimbursement.

### IV. CONCLUSION

Because the Congress left it unclear whether the remedy of § 106(b) is available to a person in Wagner's position, we are constrained to defer to the EPA's reasonable interpretation of the statute to deny reimbursement. The judgment of the district court is therefore

*Affirmed.*

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

Under § 106(b)(2) of CERCLA (the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended), 42 U.S.C. § 9606(b)(2), any "person who receives and complies" with an abatement order under § 106(a) may seek reimbursement from the President. If his petition is rejected, he may file suit against the President, and recover if he establishes in court that he was not liable for response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a). Here the Environmental Protection Agency, as delegee of the President's duties under § 106(b), see Exec.Order No. 12,580, § 4(d)(1), 52 Fed.Reg. 2923, 2926 (1987), denied Wagner Seed's petition. It read the quoted language as allowing relief only for persons who received their abatement orders after the date of enactment, October 17, 1986, though the words of the statute impose no such condition. If we owed the EPA deference on this interpretive issue, I would agree with the majority's decision to reject Wagner's suit; the statute does not clearly resolve the question and the EPA's reading is not unreasonable. See *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But *Chevron* calls for deference only when a court reviews an agency's construction of a statute "which it administers", *id.* at 842, 104 S.Ct. at 2781 (emphasis added). While Congress put the President in charge of many aspects of CERCLA, it gave the administration of § 106(b)(2) to the courts, *not* to him or his delegee. EPA has occasion to interpret the "receives and complies" language of § 106(b)(2) only because of its authority (as the President's delegee) to pay the petition-

er off and thus avert a suit. This involvement seems to me too peripheral to make *Chevron* applicable.

*Adams Fruit Co. v. Barrett*, 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990), represents the opposite pole from *Chevron*. There the Court unanimously refused to defer to the Department of Labor on the question of whether exclusivity provisions in state workers' compensation law "reverse pre-empted" a federal private right of action created by § 1854 of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–72. Despite the Secretary's power to administer the act generally, including her power to set safety standards, 29 U.S.C. § 1841(b)(2) (and the concomitant judicial deference to those judgments, see 494 U.S. at ——, 110 S.Ct. at 1391), and her general rulemaking authority under § 1861 (which she had exercised on the controlling issue), the Court refused to defer to the Secretary's views on the scope of § 1854: "Congress has expressly established the Judiciary and not the Department of Labor as the adjudicator of private rights of action arising under the statute." *Adams Fruit*, 494 U.S. at ——, 110 S.Ct. at 1390. The agency could not "bootstrap" its § 1841 authority over standards into an area in which it had "no jurisdiction". *Id.* 494 U.S. at ——, 110 S.Ct. at 1391.

This case is not quite so strongly against deference as *Adams Fruit*. There Congress had not charged the Secretary of Agriculture with *any* administrative task that called on her to interpret § 1854, so her construction was quite gratuitous. Here, as a result of the President's delegation, the EPA had to construe § 106(b)(2) as a predicate to its own action. Cf. Maj. Op. at 923. But government agencies often construe a statute as a prelude to litigation. Prosecutors must interpret criminal statutes in order to bring indictments and faithfully enforce the law, yet no court defers to their view of the statute. A more "specific responsibility for administering the law" is needed to trigger *Chevron*. *Crandon v. United States*, 494 U.S. 152, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990)

(Scalia, J., concurring in the judgment); see also *United States v. Western Electric Co.*, 900 F.2d 283, 297 (D.C.Cir.1990) (no deference to decisions reached in agency's "prosecutorial role").

Indeed, the courts appear generally to have accorded EPA no deference even in its interpretations of the liability provisions of CERCLA § 107, interpretations that EPA must make in deciding whether to sue to compel compliance or recover cleanup costs from responsible parties. See, e.g., *United States v. Kayser–Roth Corp.*, 910 F.2d 24, 26–27 (1st Cir.1990) (meaning of "owner or operator" in CERCLA § 107(a)); *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554–60 (11th Cir.1990) (same, including scope of secured creditor exemption); *United States v. Monsanto Co.*, 858 F.2d 160, 168–70 (4th Cir.1988) (meaning of affirmative defense under § 107(b)(3) and waste generator's responsibility under § 107(a)(3)); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743–44 (8th Cir.1986) (individual liability under § 107(a)(3)). As the EPA simply acts as prosecutor in such cases, the courts accord its judgment no more deference than they would a United States Attorney's decision to seek an indictment. Similarly, in deciding whether persons who refuse to comply with an abatement order have a good faith defense against EPA enforcement of fines and penalties, courts have resolved the issue independently. See *Wagner Seed Co. v. Daggett*, 800 F.2d 310, 316 (2d Cir.1986) (interpreting CERCLA § 107(c)(3)); *Wagner Electric Corp. v. Thomas*, 612 F.Supp. 736, 744–45 (D.Kan. 1985) (interpreting CERCLA § 106(b)). Decisions on each of these issues necessarily involve trade-offs between competing policy values, so the courts' independent resolution of them reflects a sense that that characteristic, even coupled with an agency's role as prosecutor, is not enough to make *Chevron* applicable. Compare Maj. Op. at 923.

The above decisions address the various substantive issues without deference to EPA, but, like *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323 (7th Cir.1990), which defers on the "receives and complies" is-

sue, they do so without analysis of the deference issue itself. One circuit court opinion, however, expressly considers the problem, refusing to defer to EPA's position on the scope of the injunctive relief authorized by the first sentence of CERCLA § 106(a). *United States v. Ottati & Goss, Inc.*, 900 F.2d 429, 434–36 (1st Cir. 1990). Rather than loosely aggregating CERCLA's many provisions and dubbing EPA its "administrator", Judge Breyer used a methodology similar to that of *Adams Fruit*, which had issued just two weeks earlier. He carefully distinguished between EPA *orders* under the second sentence of § 106(a),[1] for which the statute provides judicial review, and EPA *injunction suits* under the first sentence of § 106(a), as to which Congress used no terms suggestive of judicial review. *Id.* at 434–35. Even though EPA necessarily made an initial decision on what injunctive relief to seek, the court was to craft the injunction de novo. Here, as in *Ottati & Goss*, we do not review an EPA order but simply entertain a suit between EPA and a private firm.[2]

Here, of course, the government is the defendant not the prosecutor, but that should make no difference. The Federal Tort Claims Act, like § 106(b)(2), requires a potential plaintiff first to submit its claim to the government and to sue within a specified time after the government has disposed of the claim. See 28 U.S.C. § 2401(b) (requiring claim first to be "presented in writing to the appropriate Federal agency within two years after such claim accrues"); see also *id.* at § 2675; *Schuler v. United States*, 628 F.2d 199, 201–02 (D.C.Cir.1980) (en banc) (discussing procedure and clarifying ambiguities in statutory text). Not surprisingly, no court has ever invoked *Chevron* or deferred to an agency's views when interpreting 28 U.S.C. § 2401, although there has been no shortage of interpretive issues. See *Gould v. Department of Health & Human Services*, 884 F.2d 785, 787–88 (4th Cir.1989) (rejecting government's position on when action accrues); *Rosales v. United States*, 824 F.2d 799, 804–05 (9th Cir.1987) (same); *Nicolazzo v. United States*, 786 F.2d 454 (1st Cir.1986) (same); *Cogburn v. United States*, 717 F.Supp. 958, 960–63 (D.Mass. 1989) (holds limitations period subject to equitable tolling). As the statutory text provides no clear answers to these questions, and choosing an answer requires a balancing of competing policy interests, the solutions would be within the agency's domain if *Chevron* applied.

CERCLA and the FTCA are also similar in that neither statute singles out any particular agency for its administration. Section 106(b)(2) calls for submission of petitions to the President; he has delegated that role to the EPA, Exec.Order No. 12,-580, § 4(d)(1), 52 Fed.Reg. 2923, 2926 (1987), but has delegated other CERCLA functions to a wide range of agencies, including the Public Health Service, the Federal Emergency Management Agency, the Departments of Defense, Energy and

---

1. Section 106(a) provides in pertinent part:
   when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance for a facility, he may [through the Attorney General] secure such relief as may be necessary to abate such danger or threat, and the district court ... shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. § 9606(a).

2. The court in *Ottati & Goss* had no occasion to consider the interpretation of statutory terms relevant *both* to the validity of an order under the first sentence and an injunction suit under the second. Similarly, as the present issue can arise *only* in private suits for reimbursement, we need not consider what deference might be applicable on a legal issue that could arise either in a § 106(b)(2) suit or in judicial review of some administrative action. Section 106(b)(2)(D) specifies the arbitrary and capricious standard on one such dual-track issue (challenges to the agency's "decision in selecting the response action ordered"), but there may be others.

Transportation, and the Coast Guard.[3] The FTCA requires every claim to be presented to the "appropriate" federal agency, see 28 U.S.C. §§ 2401(b), 2675(a), and the Department of Justice has interpreted that as the "agency whose activities gave rise to the claim," 28 CFR § 14.2(b)(1). See Administrative Claims Under the Federal Tort Claims Act, 45 Fed.Reg. 2650 (1980). While the current dispensation thus gives many agencies a hand in administering the FTCA, the authority apparently could be concentrated in, say, the Department of Justice, as indeed much now is. See 28 CFR §§ 14.6, 14.7. Such a consolidation could hardly form a basis for inferring congressional intent to delegate *Chevron*-type interpretive power to the Department. Compare *Massachusetts v. Morash*, 490 U.S. 107, 116–17 & n. 11, 109 S.Ct. 1668, 1673–74 n. 11, 104 L.Ed.2d 98 (1989) (resting deference to Secretary of Labor on specific congressional delegation of rule-making authority to "define accounting, technical, and trade terms"). In any event, the President has not consolidated his CERCLA functions but rather has dispersed them among many agencies.

Here there is no basis for finding a delegation of *relevant* portions of the statute to the EPA. One might try to do so at a highly aggregate level, as the EPA received the lion's share of the President's CERCLA duties. But that route is barred by *Adams Fruit;* while recognizing that the Department of Agriculture was in primary charge of the Migrant and Seasonal Agricultural Worker Protection Act, the Supreme Court focused instead—and understandably—on its lack of any role as to the private right of action. If we look at the particular *remedy*, as *Adams Fruit* instructs us, we find the courts in charge; the EPA functions simply as the defendant's agent for purposes of advance set-tlement of suits. As in the case of criminal indictments and FTCA claims resolution, such prelitigation involvement is not enough.

\*    \*    \*

On the merits, I agree with the majority that the presumption against retroactivity, and Representative Eckart's statements on the floor, do not support the EPA. Maj. Op. at 924–925. I also agree that, to the extent that Congress enacted § 106(b) in order to provide incentives for potentially responsible parties to undertake a response action, neither the EPA's nor Wagner's reading provides a perfect fit, Wagner's being overinclusive, EPA's underinclusive. Maj. Op. at 922.

The text of § 106(b)(2)(A), however, strongly favors Wagner's reading. It grants the right to petition the President (and thus the right to sue under § 106(b)(2)(B)) to "[a]ny person who receives and complies with" a § 106(a) order as long as the petition is filed "within 60 days after the completion of the required action." 42 U.S.C. § 9606(b)(2)(A). EPA would read this as if Congress were speaking on the day the statute was enacted, October 17, 1986, and were referring to "[a]ny person who [after this date] receives and complies with" a § 106(a) order.

I see no persuasive basis for finding such an extra condition in the statute. The section makes perfect sense if read without reference to the date of enactment. While the class of persons who "receive[ ] and compl[y] with" an order includes all who have *ever* done so, the requirement that they petition "within 60 days after completion of the required action" serves as a statute of limitations (and a short one at that); it also assures that there will be no application of the statute to remedial actions completed much before enactment.[4]

---

**3.** See, e.g., Exec.Order § 2(a) (delegating President's authority under CERCLA § 104(b)(1) and 104(i) to Public Health Service); *id.* § 2(c) (delegating President's authority under CERCLA §§ 104(a), 126(b), 117 and 119 to Federal Emergency Management Agency); *id.* § 2(d) (delegating President's authority under CERCLA §§ 104(a), (b), (c)(4), 113(k), 117(a), (c), 119 and 121 to Departments of Defense and Energy); *id.*

§ 5(a) (delegating President's authority under CERCLA § 107(c)(1)(C) to Department of Transportation); *id.* § 7(b)(2) (delegating President's authority under CERCLA § 109 to Coast Guard).

**4.** CERCLA as a whole manifests no reluctance to impose retroactive *burdens* on private parties. Courts have read its liability provisions to apply retroactively to pre-enactment disposal activi-

The section contains no reference to the date of enactment, directly or even by a "henceforth" or "in the future", while other provisions of the same act make the date of enactment determinative by explicitly incorporating it into the text. See, e.g., 42 U.S.C. § 9605(b), (g)(1)(A), (g)(3), added by Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, § 105(b), (g), 100 Stat. 1613, 1625, 1627.

To overcome this language, EPA advances (besides the arguments that I join the majority in rejecting) the canon that statutes waiving the sovereign immunity of the United States should be construed strictly. *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986); *Block v. North Dakota ex rel. Board of University and School Lands*, 461 U.S. 273, 287–88, 103 S.Ct. 1811, 1819–20, 75 L.Ed.2d 840 (1983). While the canon does not sweep all before it, see *Bowen v. City of New York*, 476 U.S. 467, 479, 106 S.Ct. 2022, 2029, 90 L.Ed.2d 462 (1986) (a court must be careful not " 'to narrow the waiver that Congress intended' ") (quoting *United States v. Kubrick*, 444 U.S. 111, 118, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979) (FTCA case)), it is in any event inapplicable.

Section 106(b)(2) merely added a second procedural avenue for reimbursement from Superfund. Congress had already waived sovereign immunity in 1980 by making the fund substantively liable. Section 111(a)(2) allows Superfund to be used for:

> payment of any claim for necessary response costs incurred by any other person [other than a governmental entity] as

a result of carrying out the national contingency plan ... *Provided, however,* That such costs must first be approved under said plan and certified by the responsible Federal official;

42 U.S.C. § 9611(a)(2) (originally enacted as CERCLA § 111(a)(2), 94 Stat. 2789). Then as now, it provided that parties would be eligible for reimbursement if they were not "liable" as defined in § 107, 42 U.S.C. § 9607.[5] Until the 1986 enactment of SARA, the sole procedure for making claims against Superfund was found in § 112. See CERCLA § 112, 94 Stat. 2792–95, codified as amended by SARA, §§ 109(a)(3), 112, 100 Stat. 1633, 1646–47, 42 U.S.C. § 9612 (detailing claims procedure). Section 106(b)(2) simply added an alternative procedural route for a special class of potentially responsible parties, those who had been issued § 106(a) orders. See S.Rep. No. 11, 99th Cong., 1st Sess. 58 (1985) (§ 106(b)(2) "establishes new *procedures* for reimbursement of certain response costs and provides opportunities for judicial review of administrative orders once the response action ... is completed") (emphasis added); H.R.Rep. No. 253, 99th Cong., 1st Sess. 83 (1985). For this group, the new procedure dispenses with § 112(a)'s requirement that claims be first presented to the owner/operator of the facility and with § 112(b)'s requirement of an administrative hearing process; and instead of § 112's model of arbitration followed by judicial review under the arbitrary and capricious standard, § 112(b)(5), it provides for a civil action in which the petitioner must show the court its nonliability by a "preponderance of the evidence". 42 U.S.C. § 9606(b)(2)(C).

---

ties, see, e.g., *United States v. Monsanto Co.*, 858 F.2d at 174 & n. 31; *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d at 732–34; *United States v. Hooker Chemicals & Plastics Corp.*, 680 F.Supp. 546, 556–57 (W.D.N.Y.1988); *United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1072–79 (D.Colo.1985), as they have the SARA amendments to those provisions, see, e.g., *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1505–06 (6th Cir.1989); cf. *United States v. Rohm & Haas Co.*, 669 F.Supp. 672, 676–77 (D.N.J.1987) (SARA § 113(j) judicial review provisions apply retroactively).

5. Section 106(b)(2)(D) allows even liable parties to recover their response costs to the extent

caused by arbitrary or capricious selection of response action by the President. But this does not appear to extend substantive liability, as under § 107(a)(4)(B) a responsible party is liable only for cleanup costs "consistent with the national contingency plan" (or costs "not inconsistent" with the plan for government response action, see § 107(a)(4)(A)), and a capriciously ordered response action would not be consistent with that plan. See § 105(a)(7) (remedial measures under the NCP should be "cost-effective"). The government does not claim that this aspect changes substantive liability.

EPA argues that § 106(b)(2) extends the substantive liability of Superfund because it allows recovery of response costs even if they were not "approved under [the national contingency plan] and certified by the responsible Federal official," as required by § 111(a)(2). See Brief for Appellee at 13 n. 7, and at 24. EPA has read § 111(a)(2)'s requirement of federal approval as requiring *advance* authorization. See 40 CFR § 300.25(d).

But this is no real distinction. Only recipients of a § 106(a) *order* are eligible under § 106(b)(2). To say that § 106(b)(2) broadens Superfund's substantive liability, then, is to say that a government *order* to do something is not an *authorization* to do it. EPA offers no explanation of how an order would not encompass authorization, and I can perceive none.[6]

  *  *  *  *  *  *

As EPA does not administer § 106(b), I would not apply *Chevron* deference to its view that § 106(b)(2)(A) contains a timing requirement in addition to the one that section adopts explicitly. Construing the provision independently, I would not adopt any such view myself. Accordingly I would reverse the judgment below.

---

**6.** This view is in no way inconsistent with this court's ruling in *Ohio v. EPA*, 838 F.2d 1325 (D.C.Cir.1988), where the court upheld EPA's decision to limit the class of cases for which it would grant authorization. We did not address whether an order compelling a party to take response action constitutes authorization.